MASTIN et al. v. NOBLE et al.

(Circuit Court of Appeals, Eighth Circuit.   November 6, 1907.)

No. 2,448.

1. APPEAL—REVIEW—PRESUMPTION IN FAVOR OF CORRECTNESS OF DECREE BE-LOW.

The judgment of a court of equity on the disputed facts of a case must be taken as presumptively correct, and should be followed by an appellate court, unless an obvious error has occurred in the application of law, or a serious and important mistake has been made in the consideration of the proof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 3970–3978.]

2. CANCELLATION OF INSTRUMENTS—FRAUD—MEASURE OF PROOF.

Evidence adduced to set aside a written instrument for fraud must be clear, unequivocal, and convincing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, §§ 102, 103.]

3. DEEDS—VALIDITY—IMPEACHMENT OF FRAUD.

A conveyance secured through the influence of an agent of the grantor who has been secretly corrupted by the grantee by the promise of an inter-

est in the property conveyed is voidable for fraud by the principal, although no active fraud or misrepresentation was practiced by the agent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 16, Deeds, §§ 165–182.]

**4. EVIDENCE—PRESUMPTION—SPOLIATION OF DOCUMENTS.**

The rule as to the presumption arising from the spoliation of documents is applicable only where the element of intentional fraud or wrongful conduct is involved, and the presumption is one of fact, which may be overcome by explanation of the circumstances.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 98.]

**5. DEEDS—EVIDENCE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.**

Evidence considered, and *held* insufficient to show that an agent through whom a lease and sale of mining property were made by the owner had a secret interest in the purchase by proof so clear, unequivocal, and convincing as to warrant the cancellation of such lease and deed for fraud.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 16, Deeds, § 645.]

Appeal from the Circuit Court of the United States for the District of Kansas.

Frank Hagerman, for appellants.

Charles W. Baker, for appellee Ellen O. Schmuck et al.

Edward E. Sapp, for appellee Gabriel Schmuck.

Before VAN DEVANTER and ADAMS, Circuit Judges, and RINER, District Judge.

ADAMS, Circuit Judge. This was a bill in equity brought by the executor and sole devisee under the will of John J. Mastin, deceased, to set aside a lease and deed made by the testator in his lifetime to two of the defendants, Ellen O. Schmuck and Robert O. Kirby, conveying to them 15 acres of mineral land in Galena, Kan., and for an accounting concerning the rents, usufruct, and profits thereof. The lease was made September 1, 1894, for a term of 10 years, for the consideration of $5,000 paid on delivery, as well as for royalties reserved, and conferred upon the lessees an option to purchase the land outright at any time during the first year of their tenancy by paying an additional sum of $5,000. It was charged in the bill that defendant Noble was the testator's confidential agent, and possessed more knowledge of the character, quality, and value of the land in question than was possessed by his principal; that, while he was acting as such agent, he combined and conspired with the above-named defendants through their agent, the defendant Gabriel Schmuck, to defraud his principal by inducing him to dispose of the land on the terms stated, when in truth and in fact it was worth much more; that in the execution of their purpose complainants' agent was at the outset corrupted by the other defendants by a promise on their part in whose name the title was to be taken to give him, Noble, one-fourth interest in the land for the exercise of his influence with his principal to bring about the sale; that pursuant to such iniquitous compact and understanding the agent falsely represented that the tract of land in question contained only 10 acres, when in fact it contained 15, depreciated and understated to his principal the value of the land, and in other ways actively and effectively persuaded him to make the conveyance. The defendants denied all forms of combina-

tion and conspiracy as charged, and particularly denied that the testator's agent was ever promised any interest in the land or ever had any such interest. The case was altogether one of fact. The result depended upon conclusions to be reached on issues of fact alone. It was referred to Clifford Histed, Esq., as special master, to take the testimony and report the same, together with his findings of fact and conclusions of law, to the court. The evidence was taken, and the special master found the facts adversely to complainants and recommended that the bill be dismissed. The Circuit Court reviewed the findings so made, examined the proof, and concurred in the result reached by the master and entered a decree dismissing the bill. From this decree complainants appeal.

The reference to the special master to find the facts and conclusions of law was not made by consent of the parties. Accordingly his report is not clothed with that presumption in its favor which attends reports made on reference by consent. The trial court could not of its own motion abdicate its proper function or delegate it to any other person. The report, therefore, could be treated, as the record clearly shows the Circuit Court did treat it, as advisory only. Kimberly v. Arms, 129 U. S. 512, 523, 9 Sup. Ct. 355, 32 L. Ed. 764; Oteri v. Scalzo, 145 U. S. 578, 12 Sup. Ct. 895, 36 L. Ed. 824; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289; Blythe v. Thomas (D. C.) 45 Fed. 784. However this may be, we cannot overlook the intrinsic and persuasive value of the report. It shows unusual attention and thoroughness of consideration, and doubtless was of considerable aid to the court. The record also shows that the trial judge patiently heard the case de novo on exceptions to the report, and reached an independent judgment on the proof. There was no pro forma action on his part. We have, then, the deliberate judgment of the trial court on the disputed facts of the case. Under well-settled authority, this must be taken as presumptively correct, and should be followed, unless an obvious error has occurred in the application of law, or a serious and important mistake has been made in the consideration of the proof. Warren v. Burt, 7 C. C. A. 105, 58 Fed. 101; Stearns-Roger Mfg. Co. v. Brown, 52 C. C. A. 559, 114 Fed. 939; Hussey v. Richardson-Roberts Dry Goods Co., 78 C. C. A. 370, 148 Fed. 598, and cases cited.

Another well-established general rule governing courts of equity in cases of this kind which should be borne in mind is that the evidence adduced to set aside a written instrument for fraud must be clear, unequivocal, and convincing. Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112; Maxwell Land-Grant Case, 121 U. S. 325, 380, 7 Sup. Ct. 1015, 30 L. Ed. 949; United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384; Chicago, St. P., M. & O. Ry. Co. v. Belliwith, 28 C. C. A. 358, 83 Fed. 437. In the first of these cases the Supreme Court said:

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear, never for alleged false representations, unless their falsity is certainly proved."

With these rules for our guidance, a consideration of the facts will be entered upon. There is no evidence tending to show that any actual misrepresentation was made or any active fraud perpetrated by Noble to induce his principal to make the sale. He did not, as charged in the bill, represent that the land in question contained only 10 acres. Neither did he understate or misrepresent the value of the land or exert any active, wrongful, or undue influence to bring about the sale. Accordingly in the argument before us all charges of actual fraud of that kind were abandoned. The right of recovery was placed exclusively upon the proposition that the testator's agent, Noble, was corrupted by defendants by the promise of a secret interest in the land for the exercise of his influence in their favor with his principal, and that it was under the stimulus of that corrupting promise that the conveyance was secured. If such was the fact, the contract was voidable by the principal when seasonably assailed. Whatever might have been the effect of the agent's intervention, it was a fraud upon the principal, and could have been repudiated. Michoud v. Girod, 4 How. 502, 554, 11 L. Ed. 1076; Hoyt v. Latham, 143 U. S. 553, 12 Sup. Ct. 568, 36 L. Ed. 259; Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134; Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592; New York Central Ins. Co. v. National Protection Ins. Co., 14 N. Y. 85, 91, 92; City of Findlay v. Pertz, 13 C. C. A. 559, 66 Fed. 427, 29 L. R. A. 188; Lum v. McEwen, 56 Minn. 278, 57 N. W. 662; Alger v. Anderson (C. C.) 78 Fed. 729, and cases cited.

The fundamental question, therefore, is whether Noble, the vendor's agent, was to have an undisclosed personal interest in the land purchased. If so, his interest was in conflict with his duty, and the sale made by him to his codefendants was constructively fraudulent. Ellen Schmuck and Mr. Kirby were brother and sister, and will be referred to as the main defendants. They lived one in Ohio and one in Illinois. Gabriel Schmuck was brother-in-law of Ellen, and lived in Galena, Kansas, and acted as agent for the defendants, and Noble resided in Galena and acted as agent of the testator. Noble and Gabriel had been for some time before the events of this case close and intimate friends. They had occupied the same office, had been engaged in several business enterprises together, and had held real and personal property in common. In some instances title had been held in the name of Noble for both. Some time before the lease was executed the main defendants visited Gabriel at Galena, were shown over the land in question, and authorized Gabriel to secure a lease for them. He secured the lease, bearing date September 1, 1894, for the consideration of $5,000 paid down and certain royalties to accrue, and with it an option to purchase the land at any time within a year upon the payment of the further sum of $5,000. While this lease and option were taken in the name of the main defendants, there was an understanding that Gabriel might have one-half interest in both by paying one-half of the cost price. After September 1st Gabriel took possession as agent for his relatives, and began exploring for lead and zinc. This work resulted in the discovery of a valuable pocket of ore and the determination to exercise the option

to purchase the land. This was consummated by deed dated December 4, 1894, conveying the fee-simple title to the main defendants. Shortly thereafter Gabriel exercised his reserved right to take an interest in the purchase, and executed and delivered to the main defendants therefor his four notes, each for $1,250, and got Noble to sign them with him as surety. In this condition of things Gabriel continued to operate the mines and distributed the net proceeds accruing therefrom, one-fourth to each of the main defendants and one-half to himself for the period of two or three years—until February, 1897. By that time he had fully paid his notes given for the purchase price of his interest, and he then requested a deed from the main defendants for that interest. Without any conference or previous understanding with the main defendants or Noble, he prepared two deeds, one conveying a quarter interest to himself and the other a quarter interest to Noble, and forwarded them to his relatives for execution. They were executed without question and returned to Gabriel. The pocket of ore had then been nearly mined out.

Gabriel offered one of the deeds to Noble, but the latter declined to accept it. During these 2½ years the mines had been worked so successfully as to produce a net result of $83,000 and during that period Noble, who was conducting mining operations for his principal, and Gabriel, who was conducting like mining operations on the land in controversy, occupied the same office and continued as before on intimate terms both in a social and business way. Noble, before 1894, at a time when Gabriel was unsuccessful and poor, had befriended him in many ways, and from time to time had loaned him money for exigent needs. After 1894, when both were conducting business in the same office, Gabriel from time to time advanced Noble small sums of money for temporary convenience. In March, 1897, Gabriel turned over to Noble a check for $7,528 which he had recently received as the purchase price for lead ores sold from the mine. This is claimed by complainants' counsel to be approximately one-fourth of a dividend of $40,000 then recently declared after deducting the $5,000 paid by Noble for his interest. Before this suit was brought, complainants had instituted two other suits of kindred character—one in Cherokee county, Kan., and one in Cincinnati, Ohio. While that litigation was pending, depositions of all the defendants were taken. It is claimed by complainants that contradictory statements were found in them, and particularly that Mrs. Schmuck and Mr. Kirby both testified that Noble was to have and did have an interest in the mine. The foregoing reference to important phases of the evidence is deemed sufficient to enable us to intelligently discuss the claims of the respective parties.

Many transactions between Gabriel and Noble look suspicious and are consistent with co-operation and co-ownership of the mine by them, but an explanation is made of them by defendants' evidence, which, if it does not clearly and beyond question reconcile them with defendants' contention, leaves their significance in grave doubt and uncertainty. Noble and Gabriel, who alone knew anything about the first transaction referred to, testified in unequivocal terms that Noble signed Gabriel's notes given for the purchase price of the latter's in-

terest in the mine solely for the accommodation of Gabriel, and not at all on his own account. The two were friends, and the disinterested act of Noble was at that time not an unusual thing. Moreover, it was not attended with much risk. The rich pocket of ore just discovered gave reasonable assurance that Gabriel would be able to pay his notes as they matured. The division of surplus money on hand into fourths for dividend purposes, which is thought by complainants' counsel to be evidence that Noble had a fourth interest, was, in the light of the fact that Mrs. Schmuck and Mr. Kirby each were entitled to one-fourth only, not an unreasonable thing. It was a practical and natural method of bookkeeping. The request by Gabriel, after he had fully paid for his interest in the mine, for two deeds from the main defendants, one conveying one-fourth of the mine to himself and the other conveying a like interest to Noble and securing the execution of the deeds accordingly, are explained by both Noble and Gabriel as an effort on Gabriel's part to do a benefaction to his old friend in consideration of his former kindnesses. Their testimony is positive and unequivocal that such was its only purpose or meaning. Both emphatically deny that the deeds were secured pursuant to any prior agreement or understanding by which Noble was to have an interest; and both affirm that there never had been any such agreement or understanding. The explanation is corroborated by the fact that Noble refused to accept the deed. Whether this refusal was based on prudential reasons growing out of the fact that the mine was then practically exhausted, and that ownership of an interest might involve him in doubtful or unwise expenditures, or whether it was the expression of such amiability towards his friend as would not permit him to accept recompense for kindnesses which had cost him nothing, is immaterial. The fact remains that Noble declined to accept the deed. Complainants' theory that his refusal was inspired by a knowledge and prudent fear of that recondite principle of law which is now invoked by complainants to set aside the lease and deed in question is not plausible. All his other acts were open and above board, and we do not believe that his refusal of the benefaction in question had any sinister motive. The delivery by Gabriel to Noble in March, 1897, of the check for $7,528 is explained by both of them to have been delivered and received as payment of an old debt due from the former to the latter amounting to some $3,000 or $4,000 and for investment in bonds to the extent of the balance thereof for Gabriel. This evidence is not contradicted, but is substantially corroborated by other facts and circumstances. The only argument against its truthfulness is the supposed coincidence consisting of the fact that the amount approximates what would be one-fourth of a dividend recently declared amounting to $40,000 after making certain deductions. In view of the proof this argument has little force.

The testimony of Mrs. Schmuck and Mr. Kirby given in their depositions taken in the Cincinnati case, to the effect that Gabriel and Noble were each to have a one-fourth interest in the mine, is explained by them in their depositions afterwards given in the Kansas case and before the master in this case. They affirm that their sole information upon which they predicated their testimony was the re-

quest of Gabriel to execute two deeds for his half interest—one to him and one to Noble. They testified that no agreement or understanding to that effect was ever had; that they had let Gabriel into the venture to the extent of one-half interest, and recognized in 1897, when the deeds were requested, that he was entitle to that interest; that if he had requested them to convey it to any other persons, or in different parcels to different persons, they would ave respected his wishes, and acted accordingly, and that, when he requested the deeds made to him and Noble, they executed them as a matter of course according to the request. Their evidence, as well as that of Noble and Gabriel, is positive and unequivocal that no understanding or agreement had ever been made between them whereby Noble was to have any such interest and that positive evidence is not shaken by any kind of direct testimony. The fact so proven affords strong evidence corroborating the explanation of Mrs. Schmuck and Mr. Kirby. In valuing that explanation we should bear in mind that the witnesses were inexperienced in matters of business and court procedure and of excellent character. Mrs. Schmuck was a housekeeper living with her children in Cincinnati, and Mr. Kirby was an invalid spending his time in Paris, Ill., attempting to recuperate his health. In view of the circumstances disclosed by the proof and the character of the witnesses, we are not able to say that their explanation is not reasonable and truthful.

Whether the court below erred in excluding, so far as all of the defendants except Noble were concerned, the testimony of witnesses Huff and Wood concerning what Noble had, prior to the time of the alleged conspiracy in question, said to them about his dealings and relationship with Mastin's property, is not of much practical consequence. The testimony as admitted, so far as one of the defendants is concerned, is all preserved in the record, and is before us for our consideration. This is as it should be. Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521; Dowagiac Mfg. Co. v. Lochren, 74 C. C. A. 341, 143 Fed. 211. Giving to their testimony all the probative force which in any view it is entitled to, it does not in our opinion supplement the other evidence so as to substantiate complainants' case. We therefore find no occasion for dwelling long on its admissibility.

It is contended by complainants' counsel that there is such proof of spoliation and destruction of contemporaneous records of transactions (such as old letters, old notes and canceled checks) between Noble and Gabriel and between Gabriel and his principals that under the familiar maxim, "Omnia præsumuntur contra spoliatorem," every presumption should be indulged against the defendants and in favor of the complainants. The rule expressed by the maxim just quoted is well recognized and salutary when applied to a case of fraudulent and unexplained destruction of evidence; but, in view of the proof in this case, we think it inapplicable here. The transactions between Gabriel and Noble were not transactions which are ordinarily made the subject of book account. They were in the nature of occasional and infrequent personal accommodations, and no record of them was, in fact, made except in the form of duebills given by the borrower

and destroyed by the lender when payments were made. The correspondence between Gabriel and his principals was between intimate friends not with respect to transactions like those conducted in established and orderly business houses where books are carefully kept and correspondence carefully preserved, but they related to transactions between relatives whose habit, according to the testimony, was to destroy letters when no longer useful. The checks for dividends paid by Gabriel which when paid were returned and kept at his home were gathered up and innocently destroyed as useless and cumbersome matter by the housewife. There is no showing that any of these letters, checks, or other papers were destroyed in anticipation of litigation in which they might serve as evidence. On the contrary, we are impressed by the proof that they were destroyed as a matter of course without any fraudulent intent or purpose, and in line with the habit of many unmethodical persons. The explanation of their destruction is reasonable and satisfactory, and removes the imputation which otherwise might be proper.

In Drosten v. Mueller, 103 Mo. 624, 15 S. W. 967, the inference in question is referred to as a presumption of fact, and it is there said:

"The presumption arising from the spoliation of documents must be applied with judgment and sound discretion. * * * We see no intention on her part [in destroying the paper] to commit a fraud on any one."

In The Pizarro, 2 Wheat. 227, 241 (4 L. Ed. 226), Mr. Justice Story, in referring to the concealment and spoliation of papers in a prize case, says:

"It is undoubtedly a very awakening circumstance, calculated to excite the vigilance, and justify the suspicions of the court. But it is a circumstance open to explanation, for it may have arisen from accident, necessity, or superior force; and, if the party in the first instance fairly and frankly explains it to the satisfaction of the court, it deprives him of no right to which he is otherwise entitled."

That the element of intentional fraud or wrongful conduct must be involved to make the rule against the spoliator applicable, see Lawson on Presumptive Evidence, 203; 2 Wharton on Evidence, § 1264; Pomeroy v. Benton, 77 Mo. 64, 85, et seq., and cases cited; Warren v. Crew, 22 Iowa, 315.

Other facts and questions of law have been ably discussed by counsel. To all of them, including the voluminous testimony found in the record, we have given patient and careful consideration, but do not deem it profitable to extend this opinion by further detail. The result is inevitable. The proof is not so clear, unequivocal, or convincing as to warrant us in granting the relief prayed for. While, as already said, there are suspicious circumstances, they have been explained with such positive testimony on the part of all the defendants that we must in effect adjudge them guilty of perjury if we fail to accept the explanation. Their age, their character, their standing in the community, and the intrinsic nature of the transactions involved all forbid that we should do so. The conclusion reached by the court below manifestly and clearly was not the result of an obvious error in the

application of the law or any serious and important mistake in the consideration of the proof.

For both the reasons just stated, the decree of the court below must be affirmed; and it is so ordered.