WOOLSEY et al. v. HAYNES.

(Circuit Court of Appeals, Eighth Circuit. November 10, 1908.)

No. 2,723.

1. DEEDS (§ 211*)—VALIDITY—SUFFICIENCY OF EVIDENCE.
   To entitle a grantor to the cancellation of a deed for fraud, mistake, or the like, the evidence must be clear, unequivocal, and convincing.
   [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 643, 645; Dec. Dig. § 211.*]

2. PRINCIPAL AND AGENT (§ 156*) — ACTION AGAINST PRINCIPAL — EVIDENCE — REPRESENTATIONS OF AGENT.
   Authority to an agent to negotiate for and purchase real estate does not render statements or declarations made by the agent after the deed had been delivered and recorded binding on the principal.
   [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 583-587; Dec. Dig. § 156.*]

3. EVIDENCE (§ 271*)—DECLARATIONS—SELF-SERVING DECLARATIONS OF PARTY.
   Self-serving statements made by a party in letters written after he had reason to believe a controversy was impending are inadmissible in his behalf.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1068; Dec. Dig. § 271.*]

4. DEEDS (§ 211*)—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.
   Evidence considered, and *held* insufficient to entitle a complainant to the cancellation of a deed on the ground of the fraud of the grantee's agent.
   [Ed. Note.—For other cases, see Deeds, Cent. Dig. § 645; Dec. Dig. § 211.*]

Appeal from the Circuit Court of the United States for the District of Colorado.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Julius C. Ganter (Joseph W. Clarke, on the brief), for appellants.
E. T. Wells and W. O. Temple, for appellee.

Before VAN DEVANTER and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is a suit in equity to cancel a deed and for specific performance. The controversy grows out of the following state of facts, substantially: The appellee, Haynes, from February 9, 1905, to August 16, 1905, was the owner of an undivided one-fifth part of certain mining claims situate in what is known as the "California Mining District," in Lake county, Colo. The other interests belonged to various parties, which, prior to August, 1905, had passed by deeds to the appellant Fanny T. Fackler, the sister of the appellant Kate T. Woolsey. Mrs. Fackler resided during the times in question in the republic of Old Mexico, and was reputed to be wealthy. Mrs. Woolsey claimed to be acting in behalf of said sister in making investments of her moneys in and developing said mining properties. Prior to the acquisition of said titles by Mrs. Fackler the appellee had option contracts with the several owners of the four-fifths interests, and had an arrangement with Mrs. Woolsey for organizing a holding corporation for all the interests of said property, the shares of stock therein to be apportioned among them as agreed. At the time of the conveyances of said four-fifths interests to Mrs. Fackler the options thereon held by the appellee had expired. The claimed scheme for organization of said holding corporation fell through.

The claim now advanced in the bill of complaint is that in the fore part of August, 1905, the appellee came to another convention with Mrs. Woolsey, in which it was verbally agreed that a corporation should be organized under the laws of Colorado with a capital stock of $50,000, of which the appellee should have one-fifth, and an additional sum of $1,000 in cash; Mrs. Woolsey further agreeing to provide the funds for developing the mines. To that end he was to convey his said one-fifth interest to such corporation when organized; and that accordingly on August 16, 1905, he executed and delivered to Mrs. Woolsey such deed, with the name of the grantee blank, to be filled in with the name of the proposed corporation when organized; but in violation of this pact she inserted in the deed the name of said Fanny T. Fackler as grantee, and caused the same to be filed for record in said Lake county, and thereupon failed and refused to organize such corporation and issue to him the stock therein. By its decree the court denied the prayer for specific performance, but ordered cancellation of said deed, leaving the appellee in possession of the $1,000 cash payment made to him at the time of the execution of the deed.

The sole question for decision is, does the evidence sufficiently support the decree? The well-settled rule in practice in case of an executed contract, such as the execution, acknowledgment, and delivery of a deed to real estate which the grantor seeks to annul or correct for fraud, mistake, or the like, is that, to invoke this extraordinary power of a court of equity, the evidence must be clear, unequivocal, and convincing. It will not be exercised upon a mere preponderance of the

evidence, which, in any essential degree, leaves the issue in doubt. Maxwell Land-Grant Case, 121 U. S., loc. cit. 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Treat v. Russell, 128 Fed., loc. cit. 855, 63 C. C. A. 575; Mastin v. Noble, 157 Fed. 506, 85 C. C. A. 98.

In Atlantic Delaine Company v. James, 94 U. S. 207, 214, 24 L. Ed. 112, Mr. Justice Strong said:

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them."

In Jackson v. Wood, 88 Mo., loc. cit. 78, Norton, J., said:

"When the grantor in a deed seeks its cancellation and a reinvestiture of title on the ground of fraud or mistake, the onus of establishing the fraud is upon him or her, and before relief can be granted the fraud or mistake must be established by clear and convincing evidence. This class of cases is analogous to that class where a resulting trust is sought to be established by parol evidence, in which, in the cases of Johnson v. Quarles, 46 Mo. 423, and Forrester v. Scoville, 51 Mo. 268, the rule is laid down that to warrant a decree the evidence must be so clear, definite, and positive as to leave no reasonable ground for doubt."

Has the appellee met this requirement of courts of equity? He testified directly to his understanding of the compact between him and Mrs. Woolsey, while the latter testified as directly to the contrary. What are the correlative facts and circumstances confirmatory of the one and contradictory of the other? That the appellee, prior to August 14, 1905, consented to convey his one-fifth interest in the land is clearly inferable from the letter of Mrs. Woolsey written to him on the 14th day of August, 1905, in which she inclosed the deed for execution, saying:

"Kindly ack. the enclosed and send to me in enclosed env. at once. I started to fill in the description, but as my papers are in the Trust Co. I have not got same."

It appears from his letter, hereafter noted, that he received the letter of the 14th inclosing the deed on the 16th day of August. On the 15th day of August he wrote the following letter to Mrs. Woolsey:

"I hereby agree to accept $1,000 cash for my one-fifth undivided interest in and to the Silver Nugget mine at Leadville, Colo., being U. S. Survey No. 1030, if in addition thereto I am permitted to retain 100,000 shares of the capital stock of the Little Johnny Extension Gold Mining Co. of Arizona, you to form a company under the laws of Colorado with 50,000 shares of stock of the par value of one dollar each, and to give me 10,000 shares of said last named stock when the Co. is formed. And I hereby authorize you to change the name of the grantee in the mining deed and assignment of option on said mine now held by you, and if it cannot be done to your satisfaction I will make new deed and assignment when requested by you."

This proposition Mrs. Woolsey testified she refused, and distinctly advised Haynes that the sole consideration to be paid for his interest in the properties was the $1,000 in money; that, while he seemed much depressed and disappointed, he assented thereto. This is confirmed by the fact that, without waiting for any written reply from Mrs. Woolsey to his proposition of the 15th, he filled out the description of

the property in the deed, signed and acknowledged it on the 16th day of August, 1905, and sent it to her in the following letter:

"Your letter and deed just received. I am suffering so with disappointment and toothache that I can hardly write, but I have executed and acknowledged the deed you sent, but if it makes no difference to you erase the word thousand mentioned in the consideration. I have my reasons for not wanting the real consideration to appear and you know its customary and just as legal to say one dollar. I'll explain to you if I ever see you again. You are certainly a run-about—I thought you'd be in not later than tomorrow, there are a number of things I want to talk over with you."

The deed expressed as the consideration therefor the sum of $1,000, the receipt of which was therein acknowledged. On the same day, in payment of said $1,000, Mrs. Woolsey sent him a check, drawn by Mrs. Fackler on the Title Guarantee & Trust Company of New York, on the face of which were written the words "In full." This check he indorsed and cashed. An examination of the original deed confirms the fact of the description of the land having been written therein by a hand and with ink different from that of the other written matter in the deed. Indeed, no question is made that the appellee so wrote in the deed the description of the property. But there is nothing on the face of the deed to indicate that the name of Fanny T. Fackler was written therein at a time and with pen or ink different from the other writing in the deed sent to the appellee by Mrs. Woolsey.

The statements contained in the letter of the 16th of August, 1905, strongly tend to confirm Mrs. Woolsey's contention. He makes reference to "suffering with disappointment." He admits that "the real consideration" is $1,000; and he uses the expression, "I'll explain to you if I ever see you again;" which is little consistent with his claim that as part consideration for the conveyance Mrs. Woolsey was to go about at once the organization of a holding corporation, to be inserted in the deed as grantee, in which he was to have 10,000 shares of stock. If that was his understanding, naturally enough he would have expected to make it his business to see her soon and often. The check he received and cashed advised him that the purchase money was furnished by Mrs. Fackler; and as a lawyer of experience it is reasonable to infer that he understood the significance of the words "In full" written on the face of the check—that it was intended by the drawer to indicate her understanding that it was in full payment for the deed made; and when, without objection, he retained and cashed the check, he ratified that understanding. His suggestion in the letter respecting the concealment of the real consideration, by changing it from $1,000 to $1, shows that he expected the usual custom would be observed of putting this deed to record within a reasonable time after its delivery; otherwise, why should he be so concerned about the named consideration at that time? The placing of this deed on record in Lake county within eight days after its execution is hardly consistent with the imputation that Mrs. Woolsey was acting fraudulently in inserting the name of Mrs. Fackler as the grantee.

Further confirmation that Mrs. Woolsey was acting for and on behalf of Mrs. Fackler in taking the deed to the latter is found in the fact that immediately after the delivery thereof she wrote to the man-

ager of the mining properties advising him that Mrs. Fackler was now the owner of the entire property, and that he was to look to her as his principal or employer.

The recitation in the decree of the lower court that the purchase money for this property was that of Mrs. Woolsey is not sustained by the evidence. In addition to the uncontradicted fact that the check for $1,000 purchase money was signed by Mrs Fackler, the correspondence conducted afterwards by Mrs. Woolsey with the managing agent in charge of the mines, before any controversy arose with the appellee respecting the deed, shows that she expressed keen anxiety and concern respecting the heavy drafts being made upon Mrs. Fackler for development work on the mines, which had grown to $17,000, with no returns and little prospect therefor being made to Mrs. Fackler.

About the only countervailing circumstance relied upon by appellee is certain letters which passed between him and Mrs. Woolsey after the delivery and recording of the deed. It must not be lost sight of in determining the real question in this case that the record title to the property in question was in Mrs. Fackler. She furnished the money consideration expressed on the face of the deed. The placing on record of that deed, as to Mrs. Fackler, performed the office of livery of seisin at common law, and evidenced to the world her title to the fee. Perry v. Price, 1 Mo., loc. cit. 555; Kane v. McCown, 55 Mo., loc. cit. 198. It is this title in Mrs. Fackler, and not in Mrs. Woolsey, that the bill seeks to cancel and divest. The statements and acts of Mrs. Woolsey leading to the obtaining of the deed are admissible against and in favor of Mrs. Fackler, on the ground that Mrs. Woolsey was the active person in bringing the transaction to a consummation, and as to Haynes she was ostensibly the real party in interest. If during the period of negotiation, and at the time the deed was made and delivered by Haynes, Mrs. Fackler was an undisclosed principal, she was bound by the acts and statements of Mrs. Woolsey in connection therewith, whether or not she had any knowledge thereof. But after the purchase money was paid and the deed put to record, the fraud, if any, committed against Haynes was fully consummated. No statement made or act done thereafter by Mrs. Woolsey in the absence of Mrs. Fackler, without proof of her knowledge and assent, could bind the latter or impress her title. The bill does not allege any conspiracy between these women. It does not even allege that Mrs. Woolsey was acting as the agent of Mrs. Fackler. It is true that after the making and recording of the deed Mrs. Woolsey acted for Mrs. Fackler, according to her statements, in directing the management of the mining properties; but the funds employed therein were furnished by Mrs. Fackler. From anything appearing in this record, that was the entire extent of Mrs. Woolsey's relation to the property. It did not extend her agency to binding Mrs. Fackler by any statements made to a third party so as to affect the title of her principal to the property she was managing, or to recognize that it was impressed with any implied trust in favor of a third party. In this respect Mrs. Woolsey's statements, made after the delivery of the deed, would be as to Mrs. Fackler mere hearsay. The utmost limit of their competency

would be their employment for contradicting any contrary testimony of Mrs. Woolsey, but not as primary evidence to support the bill for the cancellation of Mrs. Fackler's deed.

Turning to the letters in question, of any pertinency, from Mrs. Woolsey: On September 18, 1905, she wrote to Haynes:

"I got a wire yesterday fr Leadville saying the Atty. I had written to to organize a company would be away a month & asking me to await his return there."

On October 8, 1905, she wrote to Haynes to the effect that she had been very ill since she went to Covington, Ky.:

"I do not expect however to remain more than a couple of weeks longer. On my return I shall call at yr office at once. I wrote my atty. at Leadville to organize a Colorado Co. for $50000. & he wrote me he would take it up at once on his return. As I have not heard fr him I suppose he is still away fr home. I will write again to day."

This is practically the extent of her statements, which are sought to be construed into a recognition of Haynes' contention respecting the agreement to organize the corporation and issue to him the 10,000 shares of capital stock. Her explanation of these supervenient communications, given in her deposition, is as follows:

"After the deed was made and recorded at Leadville I met Mr. Haynes. He seemed seriously ill and very upset over his domestic as well as financial difficulties. Knowing that he had lived in Leadville and had a large and influential acquaintance there, I said to him in a general way that some day I would organize a company and give him some stock therein. I did not specify any date or any amount of stock. I went so far as to ask my attorney at Leadville to organize such a company as I have stated before, in the belief that Mr. Haynes could indirectly be of some value towards furthering my aim."

The appellee further sought to confirm his contention by exhibiting with his deposition two letters written by him to Mrs. Woolsey; one dated December 2, 1905, in which he stated that he had made the deed of August 16, 1905, in blank, and that she promised to organize a holding company of $50,000 capital stock, of which he should have $10,000, or one-fifth. He then referred evidently to her letters above mentioned, and wanted to know what was the trouble. He then adverted to his family misfortunes and some other unimportant matters, and concluded by asking her to write to him what she was doing in the mine and whether the $50,000 corporation had been formed or not; if it had been, to send him his $10,000 of stock. He then requested her to send him the deed he executed in blank, with the name of the new company, so he could insert the name of the grantee in the deed. This latter request is somewhat remarkable, in view of the fact that his bill of complaint charges that Mrs. Woolsey was to fill in the blank in the deed with the name of the corporation when organized.

Then on the 18th day of December he wrote Mrs. Woolsey as follows:

"I hear that there has been a good strike in the Silver Nugget. I am doing nothing here (Portland, Oregon), don't you think I'd better go to Leadville and take charge of the property? One of us, as the only owners, should look after the business and as you can't stand the altitude in Leadville and it don't hurt me may be I'd better go. What salary are you willing I should have? Are you

operating under the old or new Co.? If under the latter send me my stock. Please answer at once and oblige."

These are self-serving statements made by the writer after he had reason to believe a controversy was impending respecting this matter; for shortly thereafter, as shown by his letter to Miss Miller, hereinafter adverted to, he was preparing other evidence for this lawsuit, which he instituted on the 7th day of January, 1906. A party may not thus make evidence for himself. He did, however, write two letters which are of special significance. On January 2, 1906, he wrote to Miss Miller, the notary public who took the acknowledgment of the deed of August 16, 1905, in which he stated that he acknowledged a deed before her, and that when he handed her the deed she called his attention to the fact that there was no grantee named in the deed. After stating that he was to fill that in later, she remarked, "I didn't know you could do that." He then proceeded:

"In other words you said you didn't know that a deed could be made without the grantee's name being in it. Do you remember this? The deed was to be returned to me to have the grantee's name filled in but the party to whom it was given fraudulently filled in a name and recorded it. The mine has struck rich gold ore and is valuable, and there may be a law-suit grow out of it. If so I will want your evidence and will pay you well for the time you spend in giving it."

Receiving an unfavorable answer to this letter, he returned to the effort of persuading this witness, in a letter of May 21, 1906, in which he called her attention to his letter of January 2d. reciting in effect what he wanted her to remember, after she had advised him that she had no recollection of asking him about the deed, in which he said:

"I thought perhaps that after a lapse of several months, you might remember it and therefore I write to again ask you if it has been called to your mind by my letter and ask you to answer in the enclosed stamped, addressed envelope as soon as convenient. If you remember the circumstances send me the name of a notary public before whom your deposition could be taken. I will pay the notary and also pay you for the time whatever it is worth."

The seductive intent of these letters to this woman, working for a living, is in the bait thrown out that "the mine has struck rich gold ore and is valuable, and there may be a law-suit grow out of it." Following this up immediately with the offer to pay her well for her time was most sinister. It was a covert suggestion that as the mine promised to be rich in gold, if her testimony should aid him in winning the lawsuit her payment might be measured accordingly. The cunning of his mind manifested itself in not asking her to state in the first instance what she recollected of the occurrence and conversation had, but in stating himself what occurred, to which he wanted her to testify. Although advised of her inability to depose as desired by her answer to his first letter, he waited four months and approached her with the suggestion that perhaps after the lapse of several months she might remember it. This was a remarkable suggestion, that when she did not remember the occurrence after the lapse of a little over five months, he thought she might remember it after a much longer time; and then added a postscript that he would pay her for her time whatever it

was worth. A just cause does not invite to its assistance improper methods, and an honest mind does not consent to their employment.

The record in this case fails to furnish that clear, unequivocal, and convincing proof essential to support the decree; and it must, therefore, be reversed, and the cause remanded with directions to dismiss the bill.