UNITED STATES v. PORTER FUEL CO. et al.

SAME v. PORTER FUEL CO.

(Circuit Court of Appeals, Eighth Circuit. September 3, 1917.)

Nos. 4713, 4714.

1. APPEAL AND ERROR ⬤⟿854(2)—REVIEW—MATTERS REVIEWABLE.

A decree of the trial court will not be reversed, if a wrong reason for the decree is assigned by the court in delivering its oral opinion, for the reason might be wrong and the decree right.

2. PUBLIC LANDS ⬤⟿120—MINERAL LAND—VACATION OF PATENTS.

Timber and Stone Act June 3, 1878, c. 151, 20 Stat. 89, declares in section 1 (Comp. St. 1916, § 4671), that nothing shall defeat or impair any bona fide claim under any law of the United States or authorize the sale of any mining claim or the improvements of any bona fide settler, or lands containing gold, silver, etc., or coal; in section 2 (section 4672) that any person desiring to avail himself of the provisions of the act shall file with the register a written statement setting forth, among other facts, that the land does not, as the applicant verily believes, contain any valuable deposit of mineral or of coal; and in section 3 (section 4673) that the applicant shall present satisfactory evidence to the land office that the land apparently contains no valuable deposits of coal. Act June 6, 1900, c. 791, 31 Stat. 614, relating to forest lieu selections, provides that the lands to be selected shall be confined to vacant surveyed and nonmineral lands which are subject to homestead entry. The Homestead Law (Rev. St. § 2302 [Comp. St. 1916, § 4591]) declares that mineral lands shall not be liable to entry and settlement. Held, that patents to land issued under the two acts cannot be set aside, where at the time the patents were issued the land was not known to contain valuable minerals, but, to warrant vacation of the patents, it must appear that the known conditions at the time were plainly such as to engender the belief that the land contained mineral deposits of sufficient quality and quantity to render their extraction profitable.

3. APPEAL AND ERROR ⬤⟿934(1)—REVIEW—DECREE—PRESUMPTIONS.

As the trial court heard the evidence, it will be presumed on appeal that the decree below was right, unless it appears that there has been an obvious error in the application of the law, or some serious mistake in consideration of the evidence.

4. PUBLIC LANDS ⬤⟿114(6), 120—PATENTS—PRESUMPTION AS TO VALIDITY—VACATION.

The execution of a patent itself raises a presumption that all preceding steps required by law were duly observed, and in a suit to vacate a patent on the ground that fraud was practiced on the Land Department, the government has the burden of proof, and must sustain it by evidence which commands respect and produces conviction.

5. PUBLIC LANDS ⬤⟿120—PATENTS—VACATIONS—EVIDENCE.

In a suit to set aside a patent to public lands, on the ground that the lands were coal lands and known as such at the time of the execution of

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

247 F.—49

the patent, evidence *held* insufficient to sustain the government's contention.

Stone, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the District of Colorado; Jacob Trieber, Judge.

Suit by the United States of America against the Porter Fuel Company, consolidated with a suit by the same plaintiff against the Porter Fuel Company and another. From decrees for defendants, the United States appeals. Affirmed.

Eugene B. Lacy, Asst. U. S. Atty., of Denver, Colo. (Harry B. Tedrow, U. S. Atty., of Denver, Colo., and Frank Hall, Sp. Asst. to Atty. Gen., on the brief), for the United States.

C. C. Dorsey, of Denver, Colo. (N. H. Loomis, of Omaha, Neb., on the brief), for appellees.

Before CARLAND and STONE, Circuit Judges, and MUNGER, District Judge.

CARLAND, Circuit Judge. These are actions commenced by the United States, hereafter called plaintiffs, against the Porter Fuel Company and the Continental Trust Company, hereafter called defendants, for the purpose of vacating and setting aside for fraud certain patents issued for lands located in the state of Colorado. By stipulation the actions were consolidated for trial, and they have been argued and submitted here on one record. The trial court dismissed both actions for want of equity.

The Porter Fuel Company holds the legal title to the lands in controversy, having purchased the same from the original entry people. The Continental Trust Company is the trustee under a deed of trust given by the Fuel Company to secure the payment of its bonds and covering said lands. The defendants denied the allegations of fraud, and also pleaded that they were bona fide purchasers of the land for value without notice of the alleged fraud. The trial court did not reach the question of bona fide purchaser, as it decided there was not sufficient evidence to sustain the charge of fraud. The trial court made no special findings of fact, and no general finding of fact, except as such a finding must be inferred from the decree dismissing plaintiffs' complaint. The court, however, delivered an oral opinion at the close of the evidence stating generally the reason for its judgment. There are 19 assignments of error in one case and 8 in the other, but all taken together only amount to an assignment that the trial court erred in dismissing the complaint of the plaintiffs.

[1] When counsel for plaintiffs come to demonstrate why the court erred in dismissing the complaint they present their argument under two headings as follows: (1) The District Court erred in its ruling in respect to the burden of proof. (2) The District Court erred in holding that the government was required to show that the land in suit contained a workable vein of coal. These headings are practically new assignments of error, and are based upon what the trial court said in delivering its oral opinion. The opinion of the court was not the sub-

ject of exception or assignment of error. The reasons given in the opinion for the judgment of the court might be wrong, and still its judgment right. It is what the court did, and not what it said, which is subject to exception and review. We, therefore, in the present case, are concerned only with the question as to whether the trial court erred in dismissing plaintiffs' bill of complaint, and not with its reasons for so doing, except as those reasons may throw light upon the question to be decided.

The question presented for decision is one of fact, and in considering the same it will be helpful to ascertain just what the issues were before the trial court. The record shows that fourteen of the patents in suit were issued under the act of Congress approved June 3, 1878 (20 Stat. 89), as amended by the act of August 4, 1892 (27 Stat. 348), commonly called the "Timber and Stone Act." The other three patents were issued under the act of June 4, 1897 (30 Stat. 36), as amended by the act of June 6, 1900 (31 Stat. 614), which relate to forest lieu selections.

[2] The fraud charged in the complaint with reference to the patents issued under the Timber and Stone Act is that the entry people were mere "dummies" representing the Porter Fuel Company, for whose benefit they made the entries pursuant to prior existing agreements prohibited by law, to which they subsequently conveyed the lands, and by which all of the costs involved, including the government price, were paid, and that the affidavits of the respective entry people to the contrary were false; that the lands covered by each of said entries were at the respective dates thereof known coal lands, enterable only under the Coal Land Act, and not under the Timber and Stone Act, and so known to each of the entry people; and that the affidavits of each of the entry people to the contrary were false. The fraud charged with reference to the patents issued for forest lieu selections is that the lands covered by said patents were at the several dates of the respective selections known as coal lands enterable only under the Coal Land Act, and not enterable as forest lieu selections, and that they were at the time known to be such by the respective selectors and entry people, whose affidavits to the contrary were alleged to be false.

Section 1 of the act of June 3, 1878 (20 Stat. 89 [Comp. St. 1916, § 4671]), contains this proviso:

"That nothing herein contained shall defeat or impair any bona fide claim under any law of the United States, or authorize the sale of any mining claim, or the improvements of any bona fide settler, or lands containing gold, silver, cinnabar, copper, or coal."

Section 2 of the same act (section 4672) provides that any person desiring to avail himself of the provisions of the act shall "file with the register of the proper district a written statement in duplicate * * * designating by legal subdivisions the particular tract of land he desires to purchase," setting forth, among other facts, that the land does not, as the applicant "verily believes," contain "any valuable deposit of * * * or coal." Section 3 (section 4673) provides for the final proof upon which the entry is allowed. This section provides that the appli-

cant shall present satisfactory evidence to the land office, that the land "apparently contains no valuable deposits of * * * or coal."

The act approved June 6, 1900 (31 Stat. 614), relating to forest lieu selections, provides that the lands to be selected under said act "shall be confined to vacant surveyed nonmineral public lands which are subject to homestead entry." The homestead law itself contains the following provision (R. S. § 2302 [Comp. St. 1916, § 4591]): "Nor shall any mineral lands be liable to entry and settlement under its provisions." In Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936, the Supreme Court, in speaking of the annulment of homestead patents as wrongly covering mineral land, said:

"To justify the annulment of a homestead patent as wrongfully covering mineral land, it must appear that at the time of the proceedings which resulted in the patent 'the land was known to be valuable for mineral;' that is to say, it must appear that the known conditions at the time of those proceedings were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end. If at that time the land was not thus known to be valuable for mineral, subsequent discoveries will not affect the patent. The inquiry must be directed to the situation at that time, as were the applicant's proofs and the finding of the land officers. If the proofs were not false then, they cannot be condemned, nor the good faith of the applicant impugned, by reason of any subsequent change in the conditions. We say 'land *known* at the time to be valuable for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable. * * * We also say lands known at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We therefore use the term *known* to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands, afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued. Deffeback v. Hawke, 115 U. S. 392, 404 [6 Sup. Ct. 95, 29 L. Ed. 423]; Colorado Coal & Iron Co. v. United States, 123 U. S. 307, 328 [8 Sup. Ct. 131, 31 L. Ed. 182]; United States v. Iron Silver Mining Co., 128 U. S. 673, 683 [9 Sup. Ct. 195, 32 L. Ed. 571]; Davis v. Weibbold, 139 U. S. 507, 519 [11 Sup. Ct. 628, 35 L. Ed. 238]; Dower v. Richards, 151 U. S. 658, 663 [14 Sup. Ct. 452, 38 L. Ed. 305]; Shaw v. Kellogg, 170 U. S. 312, 332 [18 Sup. Ct. 632, 42 L. Ed. 1050]; United States v. Plowman, 216 U. S. 372, 374 [30 Sup. Ct. 299, 54 L. Ed. 523]."

[3] The question of fact presented by the record is, therefore, on this branch of the case, whether the entry people or any of them at the time the proceedings were pending, which resulted in the final entry of the land, knew or had good reason to know that the lands in controversy were apparently valuable as coal lands. The theory of the plaintiffs seems to be, not that at the time of the respective entries there existed upon the lands in question, or any of them, a valuable deposit of coal which was disclosed to the eye and therefore apparent, but that as a matter of geological theory the whole region was underlaid with

a geological stratum technically designated as the "Mesa Verde formation," which or a portion thereof passed under these entries, and therefore each of the entry people committed perjury in the land office and obtained a conveyance of these lands by swearing that their respective entries apparently contained no valuable deposit of coal.

The trial court heard all the evidence in open court, and the case comes here attended by the presumption that the decree below is right, unless it shall appear that there has been obvious error in the application of the law or some serious mistake in the consideration of the evidence. Thallman v. Thomas (C. C. A., 8th Cir.) 111 Fed. 277, 283, 49 C. C. A. 317; Mastin v. Noble (C. C. A., 8th Cir.) 157 Fed. 506, 508, 85 C. C. A. 98; De Laval Separator Co. v. Iowa Dairy Separator Co. (C. C. A., 8th Cir.) 194 Fed. 423, 425, 114 C. C. A. 385; United States v. Marshall (C. C. A., 8th Cir.) 210 Fed. 595, 597, 127 C. C. A. 231; Roberts v. Roberts (C. C. A., 8th Cir.) 223 Fed. 775, 138 C. C. A. 102.

[4] The only complaint made by counsel for the plaintiffs in their arguments as to any error of law or fact committed by the trial court is, as has been stated, first, that the court in its oral opinion erred in stating the law as to the burden of proof; second, that the court erred in stating in its oral opinion that the government was required to show that the lands in suit contained a workable vein of coal. The trial court was not charging a jury, and whether or not it erred in dismissing plaintiffs' complaint can only be determined by an examination of the evidence in the record and not by an examination of the court's oral opinion.

We have spent much time in carefully considering the evidence, which is necessarily voluminous, and have arrived at the conclusion that, even if the trial court in its oral opinion placed too great a burden of proof upon the United States in the respects mentioned, there is nothing to show that such error was translated into the decree which was rendered. We understand the true rule regarding the burden of proof in cases brought to set aside land patents to be as follows:

"The respect due to a patent, the presumption that all the preceding steps required by law were duly observed, and the obvious necessity for stability in titles resting upon these official instruments, require that in suits to annul them the government shall bear the burden of proof, and shall sustain it by that class of evidence which commands respect, and that amount of it which produces conviction. Maxwell Land Grant Case, 121 U. S. 325, 379–381, 30 L. Ed. 949, 958, 959, 7 Sup. Ct. 1015; United States v. Iron Silver Min. Co., 128 U. S. 673, 676, 32 L. Ed. 571, 572, 9 Sup. Ct. 195; United States v. Stinson, 197 U. S. 200, 204, 205, 49 L. Ed. 724, 725, 25 Sup. Ct. 426; United States v. Clark, 200 U. S. 601, 608, 50 L. Ed. 613, 616, 26 Sup. Ct. 340." Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936; United States v. D. C. Beaman & Colorado Realty Holding Co., 242 Fed. 876, —— C. C. A. —— (8th Cir.).

The investigation that we have made of the evidence contained in the record has satisfied us that no such conspiracy between the Porter Fuel Company and the several entry people was entered into as alleged in the complaint.

[5] The only other question in the case is as to whether the lands in question or lands immediately adjacent to the same contained such

evidence of a coal deposit as to make it apparent to the entry people, at the time the several entries were made, that the lands in question were valuable for coal to such an extent as to be denominated within the meaning of the law as coal lands. The evidence does not show that the land itself gave evidence of containing valuable deposits of coal. The record shows, however, that the sedimentary deposits in the region where the lands in controversy are located are cretaceous rocks; that they embrace the Dakota sandstones, the Mancos shales, the Mesa Verde formation, the Lewis shales, and the Laramie sandstones. The Mesa Verde formation is from 700 to 1,000 feet in thickness. This is the formation in which coal is found in the region where the lands are located, and it is claimed that this formation extends under said lands; but the evidence also shows that this formation does not always contain coal. It must be borne in mind in considering the evidence that the question is not whether valuable deposits of coal are now known to underlie these lands, but whether at the time the lands were entered the entry people knew, or ought to have known by such evidence as appeared upon the surface of the country where the lands lie, that the lands apparently contained valuable coal deposits. The entries were all made between March 23, 1901, and July 24, 1906, both inclusive. One of the suits was commenced in 1908; the other in 1912. The cases were tried in 1915.

It would be impossible in an opinion to review all the evidence in the record, and, if all the evidence were not reviewed, it would serve no useful purpose to refer to a portion of the same. We have carefully considered the evidence, and our conclusion is that the evidence is not convincing that, at the time the several entry people made their entries, they knew or had good reason to know that the lands in question apparently contained valuable coal deposits, and that with such knowledge they deliberately and intentionally swore to the contrary. When the question of fraud is eliminated from the controversy, then the finding of the land officers of the government that the lands were not coal lands is conclusive upon the question.

It results that the decree below must be affirmed; and it is so ordered. The cross-appeals, Nos. 4720 and 4721, are dismissed.

STONE, Circuit Judge (concurring in part, dissenting in part). A painstaking examination and consideration of the entire record and all of the evidence compels me to differ in some respects with the result reached by the majority of the court.

The evidence is very convincing to me that all except one of these entrymen (William Johnson) had at the time of the entry or selection of the tract patented by him or her but one feature of the land, its coal value, in mind. Nor is there any doubt in my mind that they were correct in their estimation of the character of the land. In judging the knowledge of these entrymen, I do not at all consider the expert testimony of those witnesses who testified as to the geological formations of the district. It is hardly to be supposed that those who made the entries had any such information, though it is very probable that the officials of the Porter Fuel Company did. But consideration should be

given to those facts which would be evident to the layman and to such matters of common neighborhood knowledge as to which one living in the community could not well be ignorant. These lands were rough, rugged, and mountainous—seamed with cañons which in many places cut through and exposed the coal veins. There were numerous croppings or blossoms of this exposed coal occurring on or near practically every one of these tracts. Several mines were being operated in the immediate vicinity. Other openings into coal had been made in various places by prospectors and residents, who used the coal for household purposes. The Porter Fuel Company was operating two mines five miles apart. Ten of these tracts lie in a body touching the larger of these mines in the direction of the vein being worked on at the time. Two of the tracts were about three-fourths of a mile south of the other mine, while four were on a direct line about half way between the two mines. The remaining tract (Johnson) had at the time of entry, on or very near its southern boundary, an exposure of coal.

Fourteen of these tracts were entered as timber and stone land; the other 3 being forest lieu selections. Only one tract (Johnson) ever had on it sufficient timber to pay the government price of the land. The only stone having any value was a sandstone which underlaid the entire country for miles, and for which there was then and has since been no market or prospect of market which could induce any one to enter the land for that purpose. I do not believe that these people, some of small means would buy this land from the government for its timber and stone value, when they must have seen and known there was little or no value of that character. While all of the tracts were not so extreme, yet some light may be thrown by noting the entries of A. C. Bagby and Nettie V. Coppinger. The Bagby entry of 160 acres actually had only 14 pine trees, which scaled 3,700 feet of lumber, and piñon trees which would cut about 57 cords of wood: yet he swore before the land office receiver in making proof that he estimated the timber at 250,000 to 300,000 feet, worth $250 to $300, and he paid the government therefor $400. Mrs. Coppinger's tract had no pine trees, but piñons which would cut 5 cords of wood and 5 feet of mine prop, and scrub oak which would cut 2,500 sprag (a small mine timber); the stone was the same as on the A. C. Bagby tract. In her examination before the register she described the land as "just a mass of rocks and hillsides," and guessed the timber worth $500 to $600. She paid $400 for the tract.

My conclusion is that all of these entries were fraudulent, except that of William Johnson.

The Porter Fuel Company claims to be a bona fide purchaser and untainted by this fraud. I am convinced that it acted with these entrymen, if in fact it did not procure the entries. At the time of making these entries twelve of the remaining sixteen tracts (now omitting the Johnson tract above disposed of) were entered or selected by persons employed by the Fuel Company, having business relations with it, or closely related or employed by such, or by persons directly solicited to do so by John A. Porter, president of the Fuel Company. Excluding the Sandford entries, which by his own admission in the evidence had been

directly procured by John A. Porter, of the remaining fourteen entries eight were pointed out by William R. Mason, who was then foreman of the Fuel Company and in charge of its lands. Ten of these entries were in a block adjoining the principal mine of the Fuel Company, which was then operating upon a profitable vein of coal in the direction of these tracts and only about a fourth of a mile away from the nearest of them. Both prior to and at that time that company was unlawfully endeavoring to acquire surrounding government lands. Jethro Sandford, who acted as attorney in fact in two of the forest lieu entries here involved, at the solicitation of and as the agent of Porter, testified:

"I laid about 900 acres of scrip on lands in the vicinity of the lands in suit prior to 1906, for John A. Porter, the title of which lands afterwards went to the Porter Fuel Company."

None of these entrymen ever made any use of his tract, except in one instance to utilize some fence posts to build a fence for the Porter Fuel Company. In most instances the transfer to the company closely followed the issue of the patent by a day or two, and in several seems to have taken place even before that time.

No attempt has been made to sum up the entire evidence, with its innumerable details and circumstances pointing, in my opinion, to a deliberate plan of the Fuel Company to unlawfully acquire these government lands, but the above are cited as indications of the general trend of the evidence. I am therefore convinced that the entries were fraudulent and that the fraud was actively participated in by the Porter Fuel Company.

The Union Pacific Coal Company has brought its cross-appeal, claiming that it was at the time of suit herein a bona fide purchaser of these lands. This claim is based upon no purchase from the Porter Fuel Company of the lands in question, but upon a purchase of all of the capital stock of the Porter Fuel Company. Its theory is that the court should look through the Porter Fuel Company corporate entity to the stockholders and regard the property of that company as being held in trust for them, and, since their personnel has completely changed, should declare the holding innocent. The entire title to these lands, legal and equitable, is in the corporation as a legal entity. The rights of shareholders, generally speaking, and within certain bounds, are a proper conduct of corporate affairs by their officials, protection of the corporate property, and sharing in dividends, and, if the corporation be dissolved, in the surplus assets after payment of all debts. No trust relation, in the sense and for the purpose here urged, is sustainable. A change in personnel of part or all of the shareholders cannot alter or affect the title of the corporation to corporate property.

The Continental Trust Company has also a cross-appeal. It claims, as to four of the tracts, application of the statute of limitations governing suits to avoid land patents for fraud. It also claims as to all of them that it is a bona fide purchaser, being trustee in a deed of trust given by the Porter Fuel Company upon all of its property to secure $250,000 in bonds, of which $100,000 have been issued and are outstanding.

As to the claim for limitation: This applies to the Annetta Herr, William Johnson, George W. Shields, and Emily Mason tracts. As the Johnson tract has already been disposed of by the finding that it was not fraudulent, only the other three will be considered in respect to this point. The Statute (Act March 3, 1891, c. 561, § 8, 26 Stat. 1095, 1099 [Comp. St. 1916, § 5114]), provides that:

"Suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."

The latest of the above patents was issued January 19, 1905. The complaint to annul these patents was filed January 21, 1908, but did not include the Trust Company as a party until it was made so by amendment April 18, 1911, and subpœna issued and served the following day. Clearly the statute had run as to it covering these tracts. The Trust Company is an indispensable party to this litigation. Minn. v. Nor. Sec. Co., 184 U. S. 199, 235, 22 Sup. Ct. 308, 46 L. Ed. 499; Cal. v. S. P. Co., 157 U. S. 229, 248, 15 Sup. Ct. 191, 39 L. Ed. 683; Shields v. Barrow, 17 How. 130, 139, 15 L. Ed. 158; United States v. W. & St. P. R. R. Co., 67 Fed. 950, 15 C. C. A. 96; Chadbourne v. Coe, 51 Fed. 479, 2 C. C. A. 327; Allen-West Co. v. Brashear (C. C.) 176 Fed. 119. Therefore the complaint must fail as to these four tracts.

As to the remaining twelve tracts there remains the contention of the Trust Company that it is an innocent purchaser. The deed of trust was executed August 1, 1905. By it the Porter Fuel Company, in order to secure the payment of $250,000 of bonds, conveyed to the Trust Company 9,763 acres of land, particularly described, including by description the William Johnson, J. D. C. Rumsey (one of the Sandford tracts), Emily Mason, and Annetta Herr tracts. A further part of the conveying clause was:

"Any and all real estate and all rights and interest therein and all franchises which the said Fuel Company now owns or may hereafter acquire. * * *"

Of the four described tracts, three (Johnson, Mason, and Herr) have been disposed of above favorably to the Trust Company. All of those not particularly described were acquired by the Fuel Company *after* the execution of the deed of trust. The controversy remains, therefore, as to the Rumsey or Sandford tract, and as to those acquired by the Fuel Company and coming within the general clause above quoted.

The Rumsey tract was a forest lieu selection, made by Jethro Sandford as attorney in fact for Rumsey. It had been approved for patent before the execution of the deed of trust, but the patent was not issued to Rumsey until afterwards, and the conveyance by the patentee to the Fuel Company was more than three years after. At the date of the deed of trust the Porter Fuel Company held no title, legal or equitable, to this land. It had nothing it could pass by present conveyance, and nothing did pass thereby. This tract, if protected by the deed of trust, must find safety in the after-acquired property clause.

Does this clause protect this entry and those others coming within its terms? In my opinion it does not. Even if the Fuel Company had

had at the date of the deed of trust an equitable title to these tracts, the Trust Company could not claim to be a bona fide purchaser. Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157. But the Fuel Company never had any character of title until the patentees or their grantees executed deeds to it. While the deed of trust would then attach, to supersede all subsequent conveyances, incumbrances, liens, or equities, it could not supersede such as came with the title to the Fuel Company. To hold that trustees under deeds of trust could claim the benefits of bona fide purchasers as to after-acquired land in cases of this character would mean that the grantors therein could engage in defrauding the government of its lands, and, if they could escape detection until the patent were issued and an immediate subsequent deed made to them, the government would be barred of all opportunity to recover its domain. After-acquired property clauses derive all of their vitality from equity. It would indeed be an anomaly to employ an equitable rule to protect and in fact to encourage fraud.

My conclusion is that the patents to William Johnson, Emily Mason, Annetta Herr, and George W. Shields should be sustained by a dismissal of the complaint as to them, but that there should be an order annulling and canceling the other patents as having been fraudulently and unlawfully secured.