BENEDICT et al. v. SETTERS et al.

(Circuit Court of Appeals, Eighth Circuit. October 27, 1919.)

No. 5135.

1. APPEAL AND ERROR ⊜⊐323(1)—UNITED STATES MARSHAL AS NECESSARY PARTY.
    Where plaintiff sued to enjoin the assignees of a judgment, as well as the United States marshal, from further proceeding under an execution issued on the judgment, whereby it was sought by the assignees to exercise a claimed right of redemption of real property which once had belonged to the judgment debtor, an appeal by the assignees from an adverse judgment will not be dismissed, because the marshal did not join, for in any event the assignees were the real parties in interest.

2. COURTS ⊜⊐264(2)—ANCILLARY JURISDICTION OF FEDERAL COURT.
    When a United States marshal, under an execution issued by the federal court, seizes property, the state courts have no jurisdiction to protect the property so illegally invaded, and the remedy of one whose property is taken is by ancillary proceeding in the federal court.

---

3. COURTS ☞264(2)—ANCILLARY JURISDICTION OF FEDERAL COURT.

Where defendants, proceeding under execution on judgment of the federal court, attempted to exercise asserted rights of redemption of real property, which had once belonged to the judgment debtor, but which plaintiffs had acquired under mortgage foreclosures, *held* that, though all the parties were residents of Colorado, proceeding by plaintiffs to restrain defendants from further exercising such rights is ancillary to the judgment of the federal court, and so within its jurisdiction.

4. COURTS ☞262(2)—ADEQUATE REMEDY AT LAW AS DEFEATING ANCILLARY SUIT IN EQUITY IN FEDERAL COURT.

Where defendants, assignees of a judgment of the federal court, attempted under execution issued on the judgment to exercise claimed rights of redemption as to lands which once belonged to the judgment creditor, and which had been acquired by plaintiffs after mortgage foreclosure, *held*, that plaintiffs had no adequate remedy at law, and might by ancillary suit in the federal court restrain defendants from further proceeding.

5. INJUNCTION ☞114(2)—VENDOR PROPER PARTY TO SUIT TO PROTEST TITLE.

A vendor of land, who had acquired the same on mortgage foreclosure, etc., is a proper party plaintiff to a proceeding by his grantee, who had refused to pay the balance of the purchase price, to restrain third persons from asserting claimed rights of redemption in the land, by virtue of execution on a judgment rendered by the federal court against one who had originally owned the property, and who lost the same on mortgage foreclosure.

6. COURTS ☞343—WAIVER OF OBJECTIONS TO PARTIES UNDER FEDERAL EQUITY RULES.

Under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), where defendants filed a plea of misjoinder of parties, thus raising a question of law, and proceeded to trial on the merits without having that question set down for hearing in accordance with the rule, defendants waived the right to object to such misjoinder.

7. APPEAL AND ERROR ☞1009(3)—REVIEW OF FINDINGS OF FACT BY CHANCELLOR.

Findings of fact by a chancellor on conflicting evidence will be deemed to be presumptively correct on appeal, and unless an obvious error has intervened in the application of the law, or some serious mistake has been made in consideration of the evidence, they will not be disturbed.

8. MORTGAGES ☞594(2)—RIGHT OF JUDGMENT CREDITORS TO REDEEM FROM FORECLOSURE SALE.

The Colorado statute, giving judgment creditors the right to redeem from foreclosure sales land which had belonged to the judgment debtor, gives judgment creditors only the right of the judgment debtor.

9. MORTGAGES ☞599(1)—TIME FOR REDEMPTION BY JUDGMENT CREDITOR AFTER FORECLOSURE.

Where the owner of an interest in land which was subject to deed of trust had conveyed same to the president of a national bank to secure a loan, and the deed was foreclosed as a mortgage, and the property bought in by the president for benefit of the bank, and the owner quitclaimed to the bank any interest which he might have, and thereafter the bank acquired the original note secured by a deed of trust, and had the same foreclosed, *held*, that judgment creditors of the owner could not thereafter redeem the property; the nine and six months period allowed for redemption having long since passed, and any title of the judgment debtor having been divested years before the first deed of trust was foreclosed.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by Jacob W. Setters and another against James D. Benedict and others. From a decree for plaintiffs, defendants Benedict and Brown appeal. Affirmed.

Horace Phelps, of Denver, Colo., for appellants.

Gerald Hughes, of Denver, Colo. (Clayton C. Dorsey and E. I. Thayer, both of Denver, Colo., on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and ELLIOTT, District Judge.

ELLIOTT, District Judge. This is an appeal from a decree of the District Court of the United States for the District of Colorado, wherein appellees were plaintiffs and appellants were defendants, and will be hereinafter referred to as plaintiffs and defendants, respectively.

By decree of the trial court the defendant, together with the United States marshal and one N. Maxcy Tabor, were perpetually enjoined from further proceedings under an execution issued in that court upon a judgment in favor of the Robert Mitchell Furniture Company against said Tabor, whereby it was sought by appellant Benedict, as assignee of such judgment, to exercise a claimed right of redemption of certain real property described in the bill of complaint, under the statutes of Colorado. This property consists of an undivided one-half interest in lands located in Pueblo county, Colo.

More than 200 pages of the record in this case were devoted to a statement of the issues as they were framed in the trial court in the way of various pleadings. While it is impossible to even concisely state these issues as thus presented, the facts involving the transfers and title to the lands in controversy, as found by the trial court, briefly stated, are as follows:

May 26, 1886, George W. Skinner, Daniel T. Skinner, and N. Maxcy Tabor were the owners of the land in controversy in fee, and on that date executed a trust deed thereon to Mahlon D. Thatcher, as trustee, for the use of John George Haas, to secure the payment of $40,000.

January 31, 1888, by warranty deed, subject to trust deed to Thatcher, Daniel T. Skinner conveyed to George W. Skinner and N. Maxcy Tabor an undivided one-third interest in said premises.

July 7, 1893, Tabor conveyed to David H. Moffat his undivided one-half interest in the land, subject to said deed of trust, which, though a deed absolute on its face, was in fact a mortgage given to secure a large indebtedness of said Tabor to the First National Bank of Denver, of which Moffat was then president.

July 14, 1893, Tabor executed to Frank C. Young a general assignment for the benefit of creditors, conveying his undivided one-half interest in said lands, subject to the deed of trust in favor of Haas and to the warranty deed or mortgage to Moffat.

December 3, 1896, the Robert Mitchell Furniture Company brought an action on a claim it held against William H. Bush and N. Maxcy Tabor in the United States Circuit Court of Colorado. January 29, 1898, the furniture company recovered judgment against the defendants in said action for $26,500.

February 21, 1898, a release of the trust deed to Thatcher as trustee was duly executed and properly recorded, releasing the undivided one-half interest of George W. Skinner only, and George W. Skinner and Daniel T. Skinner were thereby released from all liability on the Haas indebtedness secured by the Thatcher deed of trust.

March 14, 1898, the judgment in favor of the furniture company against Bush and Tabor, above referred to, was filed for record in the office of the clerk and recorder of Pueblo county, Colo.

June 14, 1899, George W. Skinner by quitclaim deed conveyed his undivided one-half interest in the lands in question to the George W. Skinner Investment Company, a Colorado corporation organized June 1, 1899; Tabor being then the owner of the other undivided one-half interest therein, subject to the Thatcher deed of trust and the mortgage in form of warranty deed, above referred to, in favor of Moffat, to secure the indebtedness to him and the bank of which he was then president.

October 10, 1900, Moffat, as trustee, and the First National Bank of Denver, brought an action against Tabor, the Robert Mitchell Furniture Company, Frank C. Young as assignee of Tabor, and others, as defendants, in the district court of Pueblo county, Colo., the object of which was to foreclose as a mortgage the said warranty deed, dated July 7, 1893.

The complaint in the action contained proper recitals as to the incorporation of the furniture company, the indebtedness of Tabor to the bank and to Moffat in the sum of $228,354.34, and that to secure the payment of the same Tabor by said warranty deed had conveyed the lands in question to Moffat, as trustee, and that the same was, in fact, a mortgage to secure the indebtedness due and to become due the bank, that a portion of the debt had been paid, and reciting the balance due and unpaid. It was also therein alleged that the furniture company, one of the defendants, claimed some right, title, interest, demand, or lien in and to said property, or some part or portion thereof, by virtue of a judgment alleged to have been recovered against the defendant Tabor, which is the judgment above referred to as having been rendered in the United States Circuit Court in favor of the Company and against Tabor and Bush on January 29, 1898. In said complaint it was further alleged that the right, title, interest, estate, claim, demand, or lien, if any ever existed, or if valid at all, in favor of said defendants, or any of them, was subsequent in time, inferior, and subject to the lien of the plaintiffs as therein stated, and to the rights of the plaintiffs in and to the property in controversy. It was further alleged that said Frank C. Young, by virtue of said general assignment, claimed some right, title, and interest therein.

Relief was prayed for the foreclosure of the deed as a mortgage, that special execution issue in favor of the plaintiff against said Tabor, that the property therein named be sold, and that if it should not bring enough that a deficiency judgment should be entered for the balance against Tabor, and further that the defendants, and each and all of them, and all persons claiming under them, or any of them, be barred and forever foreclosed of any and all right, title, estate, claim,

lien, or right of redemption in and to said premises, or any part or portion thereof, and that said defendants, and each and every and all of them, be forever enjoined and restrained from setting up or asserting any estate, right, title, lien, or demand in or to said premises, or any part or portion thereof.

The notes upon which this foreclosure suit was begun were owned by the said bank, and Moffat had no interest therein. October 18, 1900, a lis pendens in due form was duly filed in the office of the recorder of said Pueblo county in said foreclosure suit.

March 6, 1901, defendants Tabor, the furniture company, and Frank C. Young as assignee, all having been theretofore duly served with process, on that date duly entered their respective appearances in said foreclosure suit, and filed a stipulation whereby they and each of them agreed to plead to the complaint therein on or before March 16, 1901, and an order of court was duly entered on that date pursuant to said stipulation.

June 6, 1901, a decree of foreclosure was entered in said foreclosure suit, reciting the entry of default against the defendants Tabor, the furniture company, and Young, and further found that the allegations of the complaint were true in all respects; that the defendant Tabor was indebted to the plaintiffs in the sum of $103,767.81; that the same was secured by said deed, adjudicated a mortgage, covering the undivided one-half interest in the premises in controversy; that said mortgage was a first and prior lien in favor of the plaintiffs as to any and all claims, interest, right, title, or estate of either or any of the defendants; and ordered that special execution issue, and that the premises be sold in the manner required by law upon foreclosure of mortgage, said decree further reciting that:

"Each of the defendants be thereupon barred and forever foreclosed of any right, title, interest, estate, claim, demand, or right of redemption in or to said hereinabove described real property or any part, parcel, or portion thereof, and forever enjoined and restrained from claiming or asserting any estate, right, title, interests, claim, or demand in, to, or against said real estate or any part or portion thereof."

It was further ordered therein that upon sale the sheriff should issue a certificate that, if not redeemed within nine months from the date of said sale, a deed would issue to the purchaser of said property or his assigns, and thereafter at the expiration of said term, if the same be not redeemed in accordance with the provisions of the statutes providing for the redemption of property from sheriff's sales, the said sheriff should make and deliver to the purchaser or his assigns a good and sufficient deed.

July 6, 1901, foreclosure sale, pursuant to said decree, was made to David H. Moffat, who was then the president of the First National Bank of Denver, for $80,000.

July 6, 1901, Tabor gave the bank three notes, aggregating $80,000, which were renewed from time to time, the interest being added to the principal, and in 1904 a note for $100,000 was given by him, and in 1911 one for $110,000. These notes were all simple memoranda made, carrying out an oral agreement that the amount paid for the land, with the interest and taxes thereon, should be kept track of, and that

Tabor could purchase the land from the bank at any time. It was, however, specifically understood at all times that Tabor had no interest in the property after the sheriff's deed upon said foreclosure sale to Moffat.

A cattle and land company, theretofore organized and controlled by George W. Skinner, agreed with said bank to pay the taxes as rental for the occupancy of the property in controversy, and such company did pay the taxes for the years 1901 to 1912, inclusive, and took the receipts pursuant to their agreement in the name of D. H. Moffat. During all of this time the property was assessed to D. H. Moffat, and for the years 1913 and 1914 the tax receipts were taken in the name of the estate of D. H. Moffat, to whom it has been assessed; Moffat having died in the meantime.

July 8, 1901, sheriff's certificate of purchase was issued in the name of David H. Moffat upon said foreclosure sale. As a fact, while this property was bid in in his name and the certificate was issued to him, he made such purchase and held such certificate for the bank of which he was the president.

March 26, 1902, Tabor and Moffat entered into a lease with the Denver & Pueblo Oil Company of the land in controversy for 20 years, which lease recited that Tabor was the owner of the legal title to said half interest, subject only to deed of trust to Thatcher, and that Moffat held sheriff's certificate of purchase, covering said undivided one-half interest, subject to said deed of trust, upon which the period of redemption for Tabor had expired and would expire as to his creditors April 6, 1902.

April 7, 1902, a sheriff's deed was issued and delivered to David H. Moffat upon said mortgage foreclosure sale for the property in controversy. That said David H. Moffat was trustee thereof for the First National Bank, and said bank thereupon took possession of all of the property in controversy.

November 22, 1905, Tabor was examined in supplementary proceedings, and it appears in the record that he then testified on oath that he had no interest in the property in question here.

December 6, 1907, a petition was filed by the Robert Mitchell Furniture Company in its action against Wm. H. Bush and others in the circuit court to revive the judgment entered January 29, 1898, which petition was filed as against Tabor only, and an order to show cause was served on Tabor December 9, 1907.

December 23, 1907, an order was entered that the judgment of January 29, 1898, should be revived as to $21,898.89, and interest from June 14, 1898, as against N. Maxcy Tabor only.

March 18, 1911, David H. Moffat died testate.

June 14, 1911, the George W. Skinner Investment Company by quitclaim deed conveyed its undivided one-half interest in the premises in question to George W. Skinner.

In September, 1912, A. V. Hunter, who had succeeded Moffat as president of the First National Bank of Denver, learned of the Haas note, secured by trust deed in favor of Thatcher, and on November 2, 1912, said Hunter, president of the First National Bank, at

the request of said bank and for its benefit, purchased for $11,000 the Haas note, secured by trust deed of May 26, 1888. That there existed an agreement with the bank by which Hunter was to hold title thereto for the bank, and turn over the note to it at any time on receipt by him from the bank of $11,000 and interest.

April 4, 1913, a quitclaim deed was executed from Tabor to the bank, covering all of the property described in the sheriff's deed of April 7, 1902, and all of the property in controversy here. That the bank thereupon accepted this deed in connection with the return to Tabor of his notes. At that time options were granted for the sale of the premises, the details of which are immaterial here.

June 30, 1914, a quitclaim deed to said premises was executed and delivered by the executor under the will of Devid H. Moffat, deceased, to the First National Bank of Denver, pursuant to an order of the county court of the city and county of Denver, theretofore duly issued in the matter of the estate of David H. Moffat, deceased, and thereby conveyed the undivided one-half interest acquired by Moffat under the sheriff's deed to him of April 7, 1902, held by him as trustee for the said bank.

January 22, 1915, the First National Bank was the owner of the lands in controversy here and covered by the Haas trust deed. As above set forth, it was also the owner of the Haas note, secured by the Thatcher trust deed, and it brought a foreclosure suit by M. D. Thatcher, trustee, and A. V. Hunter, plaintiffs, against Tabor and the First National Bank, defendants, in the district court of Pueblo county, Colo. It conclusively appears by the record that this action was brought by the bank under supposition that it was further perfecting and protecting its title to the lands in controversy. The complaint recited, in addition to the usual recitals upon foreclosure, that on February 21, 1898, Haas released George W. Skinner and Daniel T. Skinner; that prior to the commencement of this suit Tabor conveyed all his interest in the lands described in the deed of trust to the First National Bank; that said bank had acquired, by various conveyances, the right, title, and interest of Tabor in said land, and that the bank was the owner of the undivided one-half interest in the lands therein described, the same being the lands in controversy here, subject to this deed of trust to Thatcher; and that prior to the commencement of the action Haas, for value, had indorsed and delivered the notes secured thereby to Hunter, and that the balance due was $17,500, with interest at 8 per cent. from November 26, 1910.

October 7, 1915, default was entered against the defendants in the last-named foreclosure suit and a decree was entered finding, among other things, that the said bank was the owner in fee simple of the premises in controversy, formerly owned by Tabor. The court thereupon ordered the sale of the premises, with the usual provisions as to certificate of purchase and redemption, etc.

November 5, 1915, the bank paid Hunter $12,985.52, being $11,000, with interest thereupon at 6 per cent. per annum for 2 years and 3 days, and Hunter, in fulfilment of his agreement with respect to the Haas note, indorsed and delivered the same to the bank, and then

and there promised that, when the sheriff's deed was issued, he would execute a quitclaim deed to the bank in accordance with the terms of his letter to the bank's cashier, dated October 10, 1914.

December 13, 1915, sheriff's certificate of sale upon such foreclosure was duly issued to the premises in question, in favor of A. V. Hunter, for the full amount due on the note, with costs. February 12, 1916, this certificate of purchase was duly assigned and delivered by Hunter to the said First National Bank.

July 7, 1916, a warranty deed was executed and delivered by the bank to J. W. Setters, covering the property in controversy, Setters having previously purchased the same from the bank for a consid·· eration of $75,960; and at the time of the delivery of said warranty deed by the bank to Setters, the bank as part of the same transaction duly assigned and delivered to him the certificate of purchase previously assigned by Hunter to the bank.

All the foregoing instruments, except as otherwise stated, were duly filed and recorded in the proper offices, and for brevity that feature is not repeated as to each instrument; such filing being immediately after the dates of the respective instruments.

It appears from the record that, beginning about the 1st of August, 1916, one Silverstein, an attorney representing Tabor, T. H. Hood, an attorney representing the furniture company, and others, began negotiations with reference to the judgment of the furniture company against Tabor, revived as above stated. These negotiations were carried on throughout the month of August, and on September 2, 1916, an instrument was signed in Cincinnati by the officers of the furniture company, purporting to be an assignment from the Robert Mitchell Furniture Company to James D. Benedict (with a stated consideration of $100) of the judgment obtained by the furniture company against Tabor and Bush on January 29, 1898, in the United States Circuit Court, and such proceedings were had by Tabor, Benedict, the land and cattle company, and others that possession was received of said purported assignment, dated September 2, 1916, and the same was filed in said suit of the furniture company against Tabor and Bush in the United States District Court, and writ of execution was issued by the clerk of said court and delivered to the United States marshal, who thereupon signed a certificate of levy upon the property in question, and also signed an instrument purporting to be a certificate of redemption from the foreclosure sale last above set forth, and filed the same with the clerk of the trial court on September 13, 1916. This writ of execution commanded the United States marshal "that of the goods and chattels, lands and tenements of N. Maxcy Tabor, defendant, in your district, you cause to be made the sum of $21,898.-89, to satisfy a judgment" rendered January 29, 1898, revived as to Tabor on December 23, 1907. This writ was returnable to court in 90 days, but was never returned. Plaintiff Benedict deposited with the United States marshal a certified check of one Brown for $26,340.50, to redeem from the sheriff's sale to A. V. Hunter.

October 19, 1916, this suit in equity was commenced by Jacob W. Setters and the First National Bank of Denver against Samuel J.

Burris, United States marshal, and James D. Benedict, in the District Court of the United States for the District of Colorado, for the purpose of enjoining and restraining the said defendants from advertising or selling the premises under the attempted redemption, etc.

October 23, 1916, a temporary injunction was granted. Thereafter such proceedings were had that the trial court found all of the issues in favor of the plaintiffs and against the defendants, and granting the relief demanded by the plaintiffs. Thereupon the defendants Benedict and Brown perfected their appeal.

[1] We are first met by the contention of the appellees that a reversal as to the appealing defendants would be ineffectual, because in the court below the United States marshal was the only indispensable party defendant, and without his action redemption by appellants cannot occur.

It is true that as against the marshal the plaintiffs in the court below by the final decree were awarded full relief. The issues were found in favor of the plaintiffs. It was adjudged and decreed that the attempted redemption, the marshal's certificate of attempted levy, and the marshal's certificate of an attempted redemption, were and are illegal and invalid, and should be and were canceled as clouds upon the title. Plaintiff Setters' title to the property in question was declared and decreed free and clear of all claims in each and all of the defendants, and the title quieted in him. It is shown upon the face of the pleadings that the marshal was not interested personally in the result of the action, and we do not think it can be seriously urged that by not joining in the appeal he could deprive the plaintiff Setters of the right to redeem, if that right existed.

We think the other defendants were entitled to maintain the appeal separately in their own interest, although it may have been deserted by the other, the United States marshal. The proper rule in cases of this sort, where there are various defendants, seems to be that all of the defendants affected by the joint decree should be joined in the appeal. However, the rule is otherwise where the defendants have separate and distinct interests, and the decree is several, and does not jointly affect all. In the latter event, if either defendant refuses or declines, upon notice and process issued in the court below, to become a party to the appeal, then the other defendant or defendants are at liberty to prosecute the appeal for themselves and upon their own account. Todd v. Daniel, 16 Pet. 523, 10 L. Ed. 1054. This procedure was followed by the appealing defendants and severance was allowed. We think clearly the appealing defendants are the real parties in interest, that they are the defendants the decree affected adversely, and that the other defendant, the United States marshal, had no interest therein, and the defendants Benedict and Brown have properly brought the issues into this court for determination.

[2-4] The next question that is presented by the record is that of jurisdiction. It is contended by the defendants that the court below was without jurisdiction; there being no diversity of citizenship and no federal question involved, and the suit being in no proper sense

ancillary to or dependent upon the action in which the writ of execution issued.

This entire question is involved in the determination of whether or not there was in the court below a controversy ancillary and dependent, or was it a new controversy. It is argued by the defendants that the fact the redemption sought to be made was by the holder of and upon a judgment of the federal court, instead of by the holder of a judgment of a state court, was a mere fortuitous circumstance; that it had no relation whatever to the debt in controversy between the furniture company, the judgment creditor, and Bush and Tabor, judgment debtors; and therefore that their exception to the jurisdiction of the court is well taken.

This position of appellants cannot be sustained. The money judgment was entered in the court below, and such court had jurisdiction in equity to restrain further action by the marshal under the writ of execution that had been levied upon the real estate in controversy.

The question as to what facts are necessary to constitute jurisdiction of the national courts has been frequently discussed. For a compilation of citations, see Ralston v. Sharon (C. C.) 51 Fed. 709. A review of the citations in this case clearly sustains the rule that the ancillary jurisdiction of the court can be maintained where the parties to a former suit are before the court, or the facts are such as to make the case a continuation of the former suit, or where the court is called upon to enforce or vacate its judgment or decree or set aside its process, or *give relief with reference to property in its possession or under its control*, or to bring in outside parties having an interest in the litigation, or *where the property involved is in the custody of the court or its officers* and the rights of parties thereto could not be determined in any other court without a conflict of jurisdiction between the courts. Clearly, the form of proceeding must in every case be determined by the particular facts alleged in the bill, and we are of the opinion that in this case this proceeding is supplementary and ancillary, and under no rational construction can be considered a new and original proceeding, in the sense in which federal courts have sanctioned with reference to the line which divides the jurisdiction of federal courts from that of state courts.

When the United States marshal under the execution in question here seized the property of the plaintiff, as alleged in the bill, then the state courts had no jurisdiction to protect the property so illegally invaded, and plaintiff's remedy was by ancillary proceeding in the federal court, whose process had been made the instrument of the alleged wrong. Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, 28 L. Ed. 145; Covell v. Heyman, 111 U. S. 179, 4 Sup. Ct. 355, 28 L. Ed. 390.

We further conclude that, although all parties to this litigation are citizens of the state of Colorado, yet the plaintiffs were not remediless in the federal court. They were entirely within their rights in filing a bill on the equity side of the court from which the process of execution issued, which bill was not an original suit, but supplemental merely to the original, in which the execution had been issued and

levied upon the property in controversy, and the property thereby placed in the custody of the court. Freeman v. Howe, 24 How. 451, 16 L. Ed. 749.

When the property of which plaintiff claimed ownership was levied upon by the marshal upon execution in the court below, as the property of the execution defendant, a citizen of the state of Colorado, the plaintiff claiming the property being a resident of the same state, the plaintiff had no adequate remedy against the United States marshal in the state court, and rightfully sought redress in the court below, having custody of the property by this ancillary proceeding. Krippendorf v. Hyde, supra.

This disposes of the contention, so earnestly urged in the brief of the defendants, that the plaintiffs, if entitled to any relief at all, had a speedy, adequate, and complete remedy at law. The trial court, therefore, committed no error in assuming and maintaining jurisdiction of this proceeding.

[5, 6] Defendants' next contention is that it was error to permit plaintiffs to jointly maintain the suit and obtain joint relief; it being manifest that the plaintiff bank had parted with all interest that it ever had or claimed, and that plaintiff Setters had succeeded to all interest of the bank. The plea of misjoinder of parties on behalf of the defendant raises a question of law, and not a question of fact, and the record discloses that during the entire pendency of the action in the court below this question was not set down for hearing, was never heard or presented to the court, and no motion appears in the record with respect thereto. On the contrary, it affirmatively appears that all of the defendants participated to final hearing, without urging such question of misjoinder.

It may be said that the First National Bank of Denver was not a necessary party plaintiff, or that it was not the owner of the land in dispute or interested therein; but it cannot be said that it was not necessarily interested in preventing the clouding of Setters' title by attempted redemption. Setters could hold the bank by action upon the covenants of its warranty deed, and it appears by the record that he had refused to pay the bank the balance of the purchase price on account of the unlawful acts of the defendants.

Under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) this question, arising upon the face of the bill, is required to be made by motion to dismiss or answer, and—

"every defense in point of law * * * may be called up and disposed of before final hearing at the discretion of the court. * * * If the defendant move to dismiss the bill or any part thereof, the motion may be set down for hearing by either party upon five days' notice."

This not having been done, and the case having been tried through upon its merits, with no action on the part of the defendants, it was clearly nonprejudicial, and the right to object at this time was waived by the appellants, and the question is not here for determination by this court upon this appeal. The trial court did in its decree find all of the issues in the case in favor of the plaintiffs, and if it be admitted that by the defendants' answer this issue was properly joined, the

court thereby held that the bank was at least a proper party. The record clearly justifies this finding of the court, and defendants' exception is denied.

Consideration of the specification of error by defendants that by their evidence the plaintiffs failed to make out a case entitling them to equitable relief, or to any relief, brings us to a consideration of the entire record, to ascertain and determine whether or not the record supports the judgment of the court below.

[7] The trial court made general findings in favor of the plaintiffs and based its decree thereon. Thereby every fact in issue under the pleadings and evidence was found in accordance with the plaintiffs' allegations. It cannot be seriously contended that there is not evidence in the record to support plaintiffs' allegations in their pleadings upon every material issue involved. It is true there is conflict between different witnesses upon different issues. Clearly, however, there is substantial testimony sustaining every material issue found by the trial court, and where a chancellor has considered conflicting evidence, and made his findings and decree thereon, they must be deemed to be presumptively correct by this court, and unless an obvious error has intervened in the application of the law, or some serious mistake has been made in the consideration of the evidence, they will not be disturbed. Thallman et al. v. Thomas, 111 Fed. 283, 49 C. C. A. 317; De Laval Separator Co. v. Iowa Separator Co., 194 Fed. 425, 114 C. C. A. 385; U. S. v. Porter Fuel Co., 247 Fed. 773, 159 C. C. A. 627.

A review of the evidence in this case convinces us that the trial court committed no obvious error in the application of the law, and that no mistake has been made in its consideration of the evidence, and we therefore find that its findings of fact should be, and they are, affirmed.

This brings us to the real contention of the parties to this record as to the law applicable to the facts as found by the trial court. Did the trial court err in holding and decreeing that Benedict, as assignee of the Robert Mitchell Furniture Company, under the circumstances disclosed by the record, had no right to redeem the property in question? The answer to this question is decisive of this case, independent of the propositions heretofore discussed, excepting that of jurisdiction.

[8, 9] Upon this issue, the rule above announced as to the presumption of the correctness of the findings of fact by the trial court obtains, and at the outset a due consideration of the entire record impels us to affirm his findings, a brief statement of which preceded this opinion. Reference to this memorandum of transfers shows that the real question here hinges upon the right of the defendants to redeem the property in question under and by virtue of the furniture company judgment, dated January 29, 1898, as judgment creditors of Tabor.

It will be noted that Benedict claims to be the assignee of a judgment originally entered in the circuit court of Colorado on January 29, 1898, in favor of the Robert Mitchell Furniture Company and against Tabor and Bush, in the sum of $26,500. Under the statutes of Colorado this judgment ceased to be a lien against the property of the judgment debtors in six years from the date of entry, or January 29, 1904. On December 23, 1907, a judgment of revivor was entered

as against the defendant Tabor only, and judgment ordered against him for $21,898.89, with interest from June 14, 1898. The assignment under which Benedict claimed was dated September 2, 1916.

Briefly, Tabor and two others were owners of the property in question on May 26, 1886, and on that date gave a note in the sum of $40,000, and secured the same by mortgage deed thereon, naming Thatcher as trustee, and Tabor on January 31, 1888, by deed from one of his co-owners became the owner of an additional one-sixth interest therein, making his total ownership an undivided one-half interest, which is the property in controversy here. July 7, 1893, Tabor conveyed his interest in said property by deed, intended to operate as a mortgage, to Moffat, who was the president of the First National Bank of Denver, and on July 14, 1893, Tabor by general deed of assignment, pursuant to the statutes of Colorado relating to insolvent debtors, conveyed all of his property of every kind, including whatever redemption right he had in said undivided one-half interest in the land, to Frank C. Young, as assignee. Such proceedings were thereafter had that Young, as assignee, was discharged; but this property in question was never deeded back to Tabor. Thereafter Moffat brought suit to foreclose said deed of July 7, 1893, as a mortgage, making Tabor, the furniture company (holder of the judgment under which defendants now claim), and Frank C. Young, grantee in Tabor's deed of general assignment, parties defendant in said action.

It will be seen by reference to the above statement of facts that these defendants, who appeared in said action, entered into a stipulation that they would answer within a certain time. Thereafter they defaulted, and an order of default was taken, and judgment was rendered against them, recounting, among other things, the recitals above set forth, barring and forever foreclosing all right, title, interest, claim, demand, or right of redemption in and to the property in controversy, or any part thereof, and the defendants were thereby enjoined and restrained from claiming or asserting any estate, right, title, interest, claim, or demand in or to or against the real estate in question, or any part or portion thereof. Upon this foreclosure sale and in accordance therewith a sheriff's deed was issued by which Moffat, then president of the First National Bank of Denver, took title and held the same as trustee for the bank, which was the real owner thereof. The legal title, it is true, rested in Moffat, and after his death his heirs transferred that title to the bank, on June 30, 1914, by deed, pursuant to an order of the proper court.

The first consideration then, is the effect of that deed. This was an action in a court of general jurisdiction, competent to determine the issues presented. It is conceded that the Moffat mortgage was foreclosed, subject to the first mortgage for $40,000 secured by a deed to Thatcher, trustee. It will be noted by the statement of facts above set forth that these defendants in this foreclosure suit were called upon to assert any right, title, or interest they claimed, with notice of the purpose to foreclose any interest they had or claimed. The furniture company, assignor of Benedict, with the other defendants,

had the right to redeem, each under the provision of the statutes of Colorado applicable to his or its particular situation. Likewise a failure upon the part of these defendants to exercise that right and that privilege, before issuance of sheriff's deed, gave to Moffat, as trustee of the bank, all of the title of the defendant Tabor, relieved of the lien, claim, or interest in or to the premises on the part of the other defendants, including the furniture company. Tabor by said sheriff's deed was entirely divested of all right, title, or interest in or to the premises. Tabor thereafter never had any interest whatsoever in the lands in controversy, and from that time on they were owned by and were the property of the First National Bank, for whom Moffat acted in taking the sheriff's deed.

A suggestion is made by counsel for the defendants that after the First National Bank, through Moffat, acquired title to the property, the defendant Tabor had some understanding with the bank whereby he might reacquire the property upon the payment of certain sums of money, a memorandum of which was kept by notes. Admitting that such arrangement existed, it is not contended by the defendants that this would constitute a transfer of the ownership of the property, either legally or equitably. Title and ownership remained in the bank, and it is not even suggested that Tabor ever complied with any oral agreement whereby he became entitled to transfer of any title or interest therein.

The fact that this mortgage deed given to Moffat, the then president of the First National Bank of Denver, was given to him as trustee, that he held the title in trust as security for the payment of indebtedness to the bank, and that the bank was the real owner thereof— all of these facts, rightfully found by the trial court, as above suggested, determine the bank's ownership as dating from the date of the sheriff's deed to Moffat, April 7, 1902.

The plaintiffs, however, were not content to rest the title upon that sheriff's deed alone, and on April 4, 1913, Tabor executed, and, prior to July 21, 1914, delivered to the First National Bank his quitclaim deed, running to the bank, conveying the property in controversy to the bank. It therefore appears that Tabor first incumbered the title to this property by a mortgage for $40,000, secured by deed of trust to Thatcher, trustee; that he thereafter gave the deed intended to secure his indebtedness to Moffat and the bank; that thereafter a judgment was entered in favor of the furniture company, and against Tabor and another; that foreclosure was had in a court of competent jurisdiction of the mortgage given to Moffat for the benefit of the bank, in which Tabor, the furniture company (judgment creditor), and Young (the assignee under his assignment, which had been made in the meantime) were made defendants; that judgment was entered, forever barring all three defendants from asserting any claim of right, title, or interest in or to the premises in controversy; that sheriff's deed was duly issued to Moffat for the benefit of the bank, and that the bank leased the premises to the cattle and land company, upon an oral agreement that they would pay the taxes; that the lands were assessed to Moffat for a series of years, and to his estate after his

death; the title which had been held in trust by Moffat being duly conveyed by deed under order of proper court to the plaintiff the First National Bank.

Remembering that the sheritff's deed to Moffat was dated April 7, 1902, and that on April 4, 1913, Tabor executed his deed to the First National Bank, and that whatever estate Young received under and by virtue of the assignment by Tabor to him had been foreclosed by the mortgage, it would seem that there could be no question as to where the title to the property in controversy rested. After April 7, 1902, Tabor had no right, title, or interest in the property whatsoever. The decree in foreclosure perpetually barred all three defendants therein, and forever enjoined and restrained them from claiming or asserting any claim, including any claim to the right of redemption of the premises in question. The title to this land, however, was held by the bank, subject to the first mortgage for $40,000 given to Thatcher as trustee, and on November 2, 1912, A. V. Hunter, who had succeeded Moffat as president of the First National Bank, at the request of the bank and for its benefit, purchased that note, and with it the deed of trust or mortgage, which constituted a lien upon the property in question, which had once been owned by Tabor, but which had for years prior thereto been the property of the bank. This note and mortgage, so taken in the name of Hunter, became and remained the property of the bank. On January 22, 1915, at the instance of the bank and for its benefit, suit to foreclose said mortgage was instituted in the said district court for the county of Pueblo, as above set forth in the statement of facts.

As appears from the the dates of the transfers set forth in the statement herein, Tabor not only had no interest whatsoever in the property in controversy herein at the date of the commencement of this suit to foreclose this mortgage, but he had been without any such interest for a period of more than 12 years; that time having elapsed since the date of the sheriff's deed to Moffat. He was made a party to this suit solely on the ground that he was the sole remaining obligor, for the purpose of obtaining deficiency judgment in case the mortgaged property brought less than the amount of the debt—not only this, but it appears upon the face of the record that the complaint in this foreclosure suit alleged that Tabor was not the owner of the property concerning which foreclosure was sought, and it also alleged affirmatively that the First National Bank was the owner. This was repeated, also, in the prayer, and the decree in this foreclosure suit specifically found and adjudged that the First National Bank was, and that Tabor was not, the owner of the property on which foreclosure was decreed, and by such foreclosure decree it was further adjudicated and decreed that said trust deed be foreclosed, and that the interest in the property in controversy of the First National Bank of Denver be sold at public auction, etc.,

Thereafter such proceedings were had that the property was duly sold upon foreclosure, and sheriff's certificate duly issued to A. V. Hunter, who became in name the purchaser at said foreclosure sale; but whose purchase was made for and on behalf of and in the interest

of the First National Bank, which then became the owner of such certificate of purchase and all rights attending the same, and on February 12, 1916, such certificate of purchase was by Hunter duly assigned and delivered to the plaintiff the First National Bank.

Thereafter, on June 30, 1916, the First National Bank, being the owner of the entire title to the property in question, first, by sheriff's deed under foreclosure of the Moffat mortgage; second, by deed from Tabor to the bank; and being then the owner of the certificate of purchase on the last-named foreclosure sale—sold said lands in controversy here, together with other lands, to the plaintiff J. W. Setters, and duly executed and delivered its deed to him therefor, with full covenants of warranty.

Under the statutes of Colorado, upon redemption from judicial sales, six months from the date of sale is allowed for redemption by the owner whose property is sold. In this particular case that provision of the statute could not possibly refer to Tabor, because it was not his property that was sold upon the last foreclosure of the mortgage. Long prior thereto he had been divested of all of his title, and whatever title he had upon the date of the giving of the mortgage to Moffat had by the foreclosure of mortgage and sale upon foreclosure passed to and become the property of the plaintiff, the First National Bank. In addition thereto, Tabor on April 4, 1913, deeded the property to said bank. Therefore there was no right of redemption resting in him.

Under the statutes of Colorado, three months after the expiration of the time for debtor to redeem from foreclosure sale is given for redemption by judgment creditors. We think 'under this statute necessarily the judgment creditor therein referred to is the creditor of the owner of the land at the date of the beginning of the foreclosure, where the judgment constituted no lien upon the land, as in this case. Under the facts here, this mortgage foreclosure sale occurred on December 13, 1915. The period provided for redemption by the owner expired on June 12, 1916, while the right of redemption by the judgment creditor expired on September 12, 1916. It was the 12th of September, 1916, that this assignment of the judgment of the Robert Mitchell Furniture Company against Tabor in favor of James D. Benedict was filed in the office of the clerk of the United States District Court; the original judgment being dated January 29, 1898, and revived as to Tabor on December 23, 1907. It is not pretended that under and by virtue of said judgment there was any lien upon said land. Under the peculiar statutes of Colorado, a judgment creditor has the right to redeem, even though there is no lien, either by reason of the statute of limitations, failure to file records in the proper county, etc. It is under and by virtue of this assignment of this judgment, and under these circumstances, that the defendants here insist that Benedict was a judgment creditor within the meaning of this Colorado statute.

We have carefully reviewed the cases cited by the appellants, and find no decision of a court of last resort of Colorado that intimates a construction of this statute that would give defendant Benedict

the right to redeem that he here claims. Under the provisions of the Colorado statutes, a judgment creditor redeems under and by virtue of an execution issued upon his judgment, and by the payment of the amount necessary to redeem to the officer. The execution issued to the defendant the United States marshal in the case here (under which the right to redeem is claimed) specifically recited that the marshal should proceed only against the property of the defendant Tabor. The claim of the defendants here resolves itself into the proposition that, admitting that the property. is not the property of Tabor, the judgment debtor if he ever had title thereto, no matter how long before it had been conveyed to another, the property of such other can be redeemed by such creditor of the original owner, and thus the property of another taken to pay the debt represented by such judgment. Certainly a court would not construe a statute giving to the defendants the right claimed here, unless the language of the legislative act is clear and imperative—so clear that it is not susceptible of any other construction. This statute, in our judgment, is not of that character. A rational, reasonable construction of the statute gives to judgment creditors of the owners of the land, or some interest therein, the right to redeem and make their judgment claim out of such ownership, right, title, or interest of the judgment debtor. This construction is entirely consistent with the decisions cited by the appellants, and we find persuasive language used in Hartsock v. John Wright Hardware Co., 16 Colo. App. 48, 64 Pac. 245, sustaining this construction. In Ohio & Colorado Smelting Co. v. Barr, 58 Colo. 116, 144 Pac. 552, the facts involved were not unlike the record here, and it is decisive of this issue. The Supreme Court of Colorado (In re Stevenson v. Sebring, 164 Pac. 308) determined, in construing this statute, that:

"The evident purpose of the statute which provides for redemption by judgment creditors was to enable them to subject the debtor's property to the payment of his debts."

It is not intimated that it was the intent or purpose to subject the property of another to the payment of the debtor's debts. The trial court therefore committed no error in holding that the judgment debtor, Tabor, had no right, title, or interest in or to the lands in controversy at the time of the commencement of the suit to foreclosure and for years prior thereto, and therefore that no right of redemption existed under an execution issued on the judgment in the trial court against the property of the defendant Tabor.

Finding no error, the judgment of the trial court is affirmed.